J-E01004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.K., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 87 EDA 2025 |

Appeal from the Decree Entered December 10, 2024
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2024-00024

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., STABILE, J., DUBOW, J.,
KUNSELMAN, J., McLAUGHLIN, J., KING, J., SULLIVAN, J., and
LANE, J.

MEMORANDUM BY DUBOW, J.:                     **FILED AUGUST 5, 2026**

Appellant, J.K. ("Father"), appeals from the December 10, 2024 decree entered in the Wayne County Court of Common Pleas that terminated his parental rights to then-12-year-old A.K. ("Child").  Father avers that Wayne County Children and Youth Services (the "Agency") failed to present clear and convincing evidence to terminate his parental rights pursuant to 23 Pa.C.S. §§ 2511(a) and (b).  Because the record supports the trial court's finding that Father has only had intermittent involvement throughout the twelve years of Child's life, we affirm.

We glean the relevant factual and procedural history from the trial court opinion and the certified record.  Father and K.Y. ("Mother") are parents to

Child, who was born in June 2012.[1]  Child and his family have a long history of Agency involvement.  The trial court first adjudicated Child dependent in 2016, after he was physically abused by Mother's paramour.  The Agency eventually returned Child to Mother's care.  In November 2022, the Agency placed Child in foster care after Mother signed a voluntary placement agreement in response to concerns that Mother's mental health was deteriorating, Child was potentially unsupervised and unsafe in the home, and Child was begging for food.  At the time, Father was not an appropriate placement resource because Father had never had custody of Child, had not been consistent in Child's life, had a history of alcohol abuse and domestic violence, and had not seen Child in over one year.

In December 2022, the court adjudicated Child dependent and ordered Child to remain in the custody of the Agency.  On December 27, 2022, the Agency developed a permanency plan for Father with a goal of reunification. Father's objectives included:  remain crime-free; support Child in treatment; become a safe and supportive parent; and cooperate with the Agency.  N.T. Hr'g, 12/6/24, at 9-10.  Between December 2022 and April 2023, Father attended 44 out of 55 visits with Child but did little else to demonstrate that he could safely care for Child on a full-time basis and, thus, reunify with Child.

_____

[1] On December 10, 2024, the trial court terminated Mother's parental rights to Child.  Mother is not a party to this appeal and did not appeal the December 10, 2024 order.

- 2 -

In April 2023, police arrested Father for Simple Assault. In June 2023, Father began serving a sentence at SCI-Waymart, with a minimum release date of October 2024 and a maximum release date of April 2027. While incarcerated, Father consistently attended virtual visits with Child. Following a goal change hearing in May 2024, Father and Child had a final visit together on June 14, 2024.

On August 27, 2024, the Agency filed a petition to terminate Father's parental rights. The court appointed a guardian *ad litem* ("GAL") as well as legal counsel for Child. The termination petition alleged that Father only had "limited involvement" with Child prior to dependency, had no court-ordered custody or visitation rights, and had not seen Child for "over a year" prior to the Agency's involvement. TPR Petition, 8/27/24, at ¶10. The petition also cited his incarceration, his moderate compliance with the permanency plan throughout the dependency period, his minimal "progress towards alleviating the circumstances of placement[,]" and the fact that Child had been in care for 15 months with no prospect of safely returning to Father's care. ***Id.*** At the time of the petition's filing, Child lived with a foster family.

The parties proceeded to a hearing on December 6, 2024. The Agency presented testimony from Stephanie Bryant, Assistant Director of the Agency. Father, who appeared remotely due to incarceration, testified on his own behalf. The court also took judicial notice of the underlying dependency proceedings.

Ms. Bryant testified consistently with the above facts. She stated that Father's compliance with the permanency plan was "moderate" between March 2023 and May 2024, but that he did not comply after May 2024. N.T. Hr'g at 9. Regarding Father's progress towards reunification with Child, she testified that Father made "minimal" progress between October 2023 and May 2024, and no further progress after May 2024. *Id.*

Ms. Bryant further testified that Father and Child have a bond, but that it would be in Child's best interest to "sever that bond." Trial Ct. Op., 1/17/25, at 4. On cross-examination, she explained that she does not think Father is capable of performing parental duties for Child because he "has had eleven years to remedy the situation that led [Child] to care. He has never been successful in being a full-time parent to [Child]. He has always been in and out of incarceration[,] always dealing with substance abuse[,] and he has not shown any stability in his own life[.]" *Id.* at 14. Finally, she explained that Child's current placement was in a diagnostic treatment program, but that the Agency has identified a family that would be a "likely candidate to adopt" Child. *Id.* at 14-16.

Father testified on his own behalf, explaining that his minimum parole date had passed, and he was waiting to hear the results of his latest parole hearing. He further testified that he planned to live with his parents in Honesdale, Pennsylvania, following his release, but noted that the separate apartment at their home needed repairs in order to be livable, and that there

- 4 -

was not a separate bedroom for Child. He also stated that he would be employed after his release.

Father also testified that he has had an informal custody arrangement with Mother since Child was 5 years old, but he had never sought custody through the courts, fearing that Mother would prevent him from seeing Child if he indicated that he wanted a formal custody arrangement. He further testified that he did not want the court to terminate his parental rights and that he would be willing to do what was necessary for Child, including going to therapy with him.

On December 10, 2024, the court issued an order terminating Father's parental rights pursuant to Sections 2511(a)(2), (5), (8) and (b).

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

1. Whether the trial court erred as a matter of law in determining that [the Agency] had met its burden of proof in this involuntary termination of parental rights in this matter?

2. Whether the trial court erred as a matter of law in determining that termination of parental rights of [Father] was warranted?

3. Whether the trial court erred as a matter of law in determining that termination of parental rights of [Father] was in the best interests of [Child]?

Father's Br. at 8 (reordered for ease of disposition).[2]

\* \* \*

In cases involving the involuntary termination of parental rights, our review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse "merely because the record would support a different result." *T.S.M.*, 71 A.3d at 267. We give

_____

[2] Father's attorney, Steven Burlein, Esq., originally filed a petition to withdraw as counsel as well as an *Anders* brief indicating that, upon review, Father's appeal was wholly frivolous. *See Anders v. California*, 386 U.S. 738 (1967). Father did not respond. Two judges of a three-judge panel of this Court reversed the trial court's decision to terminate Father's parental rights and granted Attorney Burlein's request to withdraw. The author of this Memorandum issued a dissent, finding the evidence sufficient to terminate Father's parental rights. The Agency and the GAL both filed timely petitions for reargument, which this Court granted and withdrew its previous decisions. Attorney Burlein has now filed an advocate's brief for review by this *en banc* panel. Accordingly, Attorney Burlein's request to withdraw as counsel is now moot.

great deference to the "trial courts that often have first-hand observations of the parties spanning multiple hearings." *Id.* "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *L.A.K.*, 265 A.3d at 591 (internal citations omitted). Accordingly, "[i]n recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts [at] issue." *Id.* at 592 (citations and internal quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, which governs termination of parental rights, requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated

in Section 2511(a)." *Id.* (citation omitted). "[I]f the court determines that the parent's conduct warrants termination" of his parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted). Notably, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008). In its opinion, the court concluded that termination was warranted pursuant to Sections 2511(a)(2), (5), and (8). We concentrate our analysis in this case on Section 2511(a)(2).

* * *

Section 2511(a)(2) provides for termination of parental rights where the petitioner demonstrates by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2); *see also In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012). The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; "those grounds may [also] include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (citation omitted), *abrogated on other*

- 8 -

*grounds by **In re K.T.***, 296 A.3d 1085 (Pa. 2023). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." ***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019). Notably, a "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re Z.P.***, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

With respect to incarcerated parents, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." ***S.P.***, 47 A.3d at 830 (citation and internal quotation marks omitted).

Finally, "sincere efforts to perform parental duties" may still be insufficient to remedy an incapacity. ***Z.P.***, 994 A.2d at 1117 (citation omitted). This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being[,]" especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." ***Id.*** (citation omitted).

The trial court emphasized that Father had failed to perform parental duties for Child throughout Child's entire life and that Father was unlikely to be able to perform parental duties any time soon. The trial court opined:

the parenting deficits that led to the removal of [Child] from the care of [] Father still existed and were not likely to be remedied within a reasonable period of time. It is evident that Father had not been able to maintain custody and control of [Child] and is not able to progress toward alleviating the circumstances that led to [Child's] placement with [the Agency], such as being a law[-]abiding citizen, supporting [Child,] and being a safe, responsive parent. [Child], who was 12 years old at the date of the hearing, deserves permanency.

Trial Ct. Op. at 3.

Based on our review, we conclude that the trial court properly exercised its discretion in terminating Father's parental rights pursuant to Section 2511(a)(2). Ms. Bryant's unrebutted testimony established that Father had a history of domestic violence, substance abuse, and incarceration. *Id.*; N.T. Hr'g at 8, 11. Additionally, although Father attended visits with Child following the commencement of the dependency proceeding in December 2022, he had not had contact with Child in the year prior to that proceeding and has never been a full-time parent to Child. N.T. Hr'g at 8, 17. Most importantly, Father's intermittent contact with Child throughout Child's life and lack of effort to care for Child on a regular basis demonstrated that he could not provide safety, security, and stability for Child on a full-time basis and, thus, be reunified with Child. Father's supervised visits do not overcome the evidence in the record that Father lacked the capacity to parent Child on a regular basis. Accordingly, the record supports the court's finding that Father has not made reasonably prompt progress towards being a safe, supportive, and responsive parent. Trial Ct. Op. at 3.

- 10 -

Father argues that the Agency failed to present clear and convincing evidence to terminate under Section 2511(a) because it relied exclusively on the testimony of Ms. Bryant, who is the Assistant Director of the Agency, rather than a social worker who had regular contact with Child. Appellant's Br. at 22. We remain unpersuaded. Ms. Bryant explained that even though she was promoted to Assistant Director, that she was previously "the supervisor that oversaw [Child]'s case through the dependency and [had] prior knowledge of his family since [she] started at the [A]gency thirteen years ago." N.T. Hr'g at 5. It was within the trial court's discretion to place weight on Ms. Bryant's uncontradicted testimony, and her testimony serves as support for the trial court's findings.

Accordingly, the court properly concluded that Father had failed to provide essential parental care, control, and subsistence to Child, and that Father could not remedy his parenting deficits within a reasonable period of time. Thus, we discern no abuse of discretion in the court's decision to terminate Father's parental rights under Section 2511(a)(2).

* * *

Regarding Section 2511(b), our analysis focuses on the effect that terminating parental rights will have on the child. We review the court's conclusion as to "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved

in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005). "The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Interest of K.T.*, 296 A.3d 1085, 1106 (Pa. 2023) (citation omitted).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa. Super. 2018) (citation omitted). If a bond exists, the court must consider whether terminating parental rights would destroy an "existing, necessary, and beneficial relationship." *K.T.*, 296 A.3d 1109 (Pa. 2023) (citation omitted). Our Supreme Court has explained:

> Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

*T.S.M.*, 71 A.3d at 269. Moreover, "[i]n weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to

see to their healthy development quickly." *Id*. Ultimately, the concern is the needs and welfare of the child. ***Z.P.***, 994 A.2d at 1121.

The trial court concluded that termination was in Child's best interests pursuant to Section 2511(b) "because it would best serve [Child's] developmental, physical, and emotional needs and welfare." Trial Ct. Op. at 4. The court found credible Ms. Bryant's testimony that although Father and Child had a bond, she "believed it would be in [Child's] best interest for the [c]ourt to sever that bond." *Id.* at 3. The court opined that, "[a]lthough Father and [Child] have had remote visits via Zoom during Father's incarceration, Father has not been able to effectively and appropriately provide [Child] with his parental needs[,]" that Father confirmed that he had never sought custody of Child prior to Child's placement with the Agency, and that Child would not be able to live with Father immediately upon parole because his housing needed renovations and did not have a separate bedroom for Child. *Id.* at 4. Finally, the court noted Ms. Bryant's testimony that the Agency "had identified a family as a likely candidate to adopt [Child], which would bring security and stability to [Child's] life." *Id.*

The record supports the trial court's findings. Although Ms. Bryant testified that Father and Child have a bond, she also opined that severing the bond would be in Child's best interest. N.T. Hr'g at 11-12. The record demonstrates that Child's relationship with Father has lacked stability and consistency due to Father's intermittent presence in Child's life. In fact, Father

- 13 -

did not visit with Child for over a year prior to the Agency's involvement. Father has never been a full-time parent to Child and is unlikely to be able to perform the necessary parental duties anytime soon. Just because Child and Father have a bond, does not mean that it is a necessary and beneficial bond. On the contrary, the record shows that for over a decade Father has failed to consistently provide love, comfort, security, and stability to Child. The court also observed that the potential adoptive resource could provide that permanency and stability to Child. We discern no abuse of discretion.[3]

Father argues that the trial court erred when it relied solely on Ms. Bryant's testimony regarding parent-child bond without the benefit of any additional supporting testimony or evidence. Father's Br. at 23. Father further argues that the record is devoid of any testimony or evidence regarding then-twelve-year-old Child's position or feelings regarding adoption. *Id.* Finally, Father asserts that adoption is not in Child's best interest because, at the time of the hearing, Child was no longer placed in a pre-adoptive home

_____

[3] The dissent implies that Father had a meaningful and beneficial bond with Child because Child is twelve years old rather than two years old. *See* Dissenting Memorandum at 21. We reject this proposition because even though Child is twelve years old, Father, through his lack of effort, never cared for Child on a consistent basis and, therefore, never had the opportunity to develop a meaningful and beneficial parent-child bond. At best, Father was a friend to Child for the past twelve years. Moreover, given Child's age and the "ticking clock of childhood," every moment of delay in achieving permanency poses a threat to Child's best interest. *See T.S.M.*, 71 A.3d at 269.

but, rather, in a residential treatment facility. *Id.* Father's arguments are unavailing.

It is well-settled that "the [trial] court is free to rely upon the assessments of social workers and caseworkers" with regards to bond. *In re Adoption of J.N.M.*, 177 A.3d 937, 945 (Pa. Super. 2018). We discern no error in the trial court basing its findings on Ms. Bryant's testimony.

Moreover, our Supreme Court has explained that there is no bright-line rule requiring counsel and the courts to place Child's preferred outcome on the record:

> Children for whatever reason may understandably resist stating whether their parents' rights should be terminated and may be averse to declaring their preference between their natural and foster parents. While we recognize that it may be a best practice for a child's legal counsel to divulge the child's preferences in order to advocate for their client's preferred outcome, we find nothing in the language of the Adoption Act requiring that their preference be placed on the record, which instead only requires that the child be appointed counsel. Moreover, we observe that the child's legal counsel has a duty of confidentiality to their client, the child, such that they should not be compelled to disclose the child's preferences. We are thus wary to create a bright-line rule requiring counsel and the courts to place the children's preferred outcome on the record as we are concerned by both the potential violation of a child's attorney-client privilege and with the real specter of placing unconscionable stress on a child by mandating that her feelings regarding her parents and caretakers be made public and permanently enshrined in the record.

*In re Adoption of K.M.G.*, 240 A.3d 1218, 1237–38 (Pa. 2020). Based on the above, we conclude that the trial court did not abuse its discretion when it made a finding regarding Child's best interest without ascertaining Child's preference.

- 15 -

Finally, this Court has clarified that the "termination statute does not require children to be placed in a pre-adoptive home as a precondition to termination of parental rights." *In re K.C.F.*, 928 A.2d 1046, 1054 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511). Therefore, the trial court was within its discretion to find that a termination of Father's parental rights was in Child's best interest even though Child was not placed in a pre-adoptive home.

* * *

In sum, bearing in mind our required standard of review, we discern no abuse of discretion in the court's decision to terminate Father's parental rights under Sections 2511(a)(2) and (b). The record supports the trial court's findings and we decline to usurp the court's credibility determinations or reweigh the evidence.

Based on Ms. Bryant's testimony, the trial court properly concluded that Father had failed to provide essential parental care, control, and subsistence to Child, and that Father could not remedy this and reunify with Child within a reasonable period of time pursuant to Section 2511(a)(2). Unfortunately, the record is clear that between the time that the trial court adjudicated the Child dependent and the termination hearing, Father had not demonstrated the ability to provide safety, security, and stability for Child on a full-time basis and failed to demonstrate that he would be able to reunify with Child anytime soon. In addition, the record supports the court's finding that termination would be in Child's best interest because the evidence established that Child's

relationship with Father has lacked stability and consistency due to Father's intermittent presence in Child's life.

On a final note, we recognize that the record in this case is decidedly sparse. However, our standard of review compels this Court to focus on whether the record supports the trial court's findings rather than contemplate what evidence could bolster the trial court's findings. Moreover, especially in cases that are close calls, we must show deference to the trial court's findings. We may not reverse "merely because the record would support a different result," and we decline to do so. *See T.S.M.*, 71 A.3d at 267.

Decree affirmed. Petition to withdraw as counsel denied as moot.

President Judge Lazarus joins the Memorandum as well as President Judge Emeritus Panella, and Judges Kunselman and McLaughlin.

Judge Sullivan files a Dissenting Memorandum which Judges Stabile, King, and Lane join.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/5/2026

- 17 -